## McGough v. Atkinson et al.

*Allen S. Olmstead, 2nd,* and *Albert E. Holl, Jr.,* for plaintiff.

*Ernest L. Green, Jr., Lemuel B. Schofield* and *John B. Brumbelow,* for defendants.

ERVIN, P. J., June 1, 1950.—This is an action of replevin without bond which was tried by the court without jury before Ervin, P. J., under the provisions of the Act of April 22, 1874, P. L. 109, as amended. At the trial both sides waived requests for findings of fact and conclusions of law. By the provisions of Pa. R. C. P. 201, this agreement is just as effective as if it had been stipulated in writing. Irrespective of the stipulation, the amendment of July 10, 1935, P. L. 640, provided that the court need only file findings of fact and conclusions of law "if requested by counsel for either party for the purposes of filing exceptions or for the taking of an appeal". Therefore, we shall not at this time make formal findings of fact but shall discuss so much of the evidence as is essential to our decision. It either party desires at a later date to file exceptions or to take an appeal, at that time requests for findings of fact and conclusions of law may be submitted.

Plaintiff's complaint was filed originally against defendant Richard Atkinson, alleging that plaintiff was the owner of a race horse, Wild Drift, which he had

purchased at a claiming race at Hialeah Park, Hialeah, Fla., on January 19, 1949, for the sum of $8,000; that for a time the horse disappeared and plaintiff had no knowledge of its whereabouts; that after diligent search he discovered the horse to be in Atkinson's possession; that he had made demand upon Atkinson to deliver possession but that the latter refused to do so. Defendant Atkinson filed an answer admitting that the horse was in his possession and alleging that he was without knowledge of the other averments of the complaint and set forth as new matter that on or about August 1, 1949, one Thomas Malone delivered the horse to him and that Malone has at all times claimed to be the true owner of the horse. Thomas Malone then presented a petition for leave to intervene as a party defendant, which leave was granted on November 14, 1949. Thereupon Malone filed an answer to the complaint denying that plaintiff was the owner of the horse and alleging that the $8,000.00 was furnished to the plaintiff by the defendant Malone for the purpose of claiming said horse for Malone.

As was succinctly stated by Mr. Olmsted at the trial: "The basic issue, I believe, will be whose $8,000 was it? Defendant claims it was Malone's $8,000 and we claim it was not." The case turns upon the credibility of the witnesses.

Before discussing the evidence it is necessary to understand just what a claiming race is and who are entitled to present a claim. As alleged in the complaint and admitted in the answer a claiming race is one in which a valuation is put on the horses entered in that race. Prior to the running of the race owners of other horses at the race meet have the privilege of depositing with the steward of the race an amount of money equal to the valuation placed on the horses in the race, for which the steward gives a receipt to the depositor. At the same time the depositor places in a locked container

a slip of paper containing his name and the name of the horse he is claiming. Subsequent to the running of the race the depositor notifies the steward as to whether he then desires to claim the horse. Upon such notification in the affirmative, the claimed horse becomes the sole property of depositor-claimant and is delivered over to him. The purpose of claiming races is to deter an owner of a superior horse from entering it in races with horses which are not its equal. He may still do so but if he does, he takes the chance that someone entitled to do so will claim the horse at the value fixed upon the race. However, the only persons entitled to enter a claim are the owners of other horses which have run at that race meeting. Therein lies the crux of the present case.

There is no doubt that the horse, Wild Drift, was entered in the seventh race at Hialeah, an $8,000 claiming race, on January 19, 1949, and that it was claimed in the name of plaintiff McGough. McGough testified that he borrowed the $8,000 necessary to claim the horse from one Harry Rubin; that although he did not give Rubin any note or receipt for the $8,000 he was to repay him out of the prize money which the horse might subsequently win; that he has repaid $600 and still owes Rubin a balance of $7,400. Rubin corroborated McGough's story and testified that he did lend him $8,000; that he had repaid $600 and that McGough still owed him $7,400. Rubin admitted that he got the $8,000 in cash from intervening defendant, Malone, on the morning of the day of the race but testified that this money was a compromise of a gambling debt owed by Malone to him.

On the other hand, Malone testified that the horse was being claimed for him; that he was ineligible to claim the horse in his own name and therefore contacted Harry Rubin; that Rubin was also ineligible to claim the horse because the latter had not run a horse

at that race meeting, so he asked Rubin if the latter could find someone who would be eligible to make a claim and Rubin suggested plaintiff McGough; that he then obtained the cash from his bank and delivered it to Rubin with instructions to deliver it to McGough for the purpose of claiming the horse for him. He denied that he owed Rubin any amount of money on a prior gambling transaction.

Thus it will appear that everybody admits the actual cash came from Malone's bank on the morning of January 19, 1949. The real issue, therefore, is whether or not at the time Malone delivered the cash to Rubin he was doing so in repayment of a gambling transaction or was delivering it to him as a trustee. The decision in this case is not an easy one. The only witnesses who testified as to the alleged prior gambling transaction were Rubin and Malone. Therefore the court admitted considerable testimony as to extraneous matters for the purpose of enabling him to judge their credibility.

McGough, Rubin and Malone contradicted themselves in many particulars. Throughout the testimony the name of one Robert Conley was frequently mentioned. As a result the court expressed a desire to hear his testimony if possible. For example, to cite only one, a receipt (defendants' exhibit no. 1) was offered in evidence showing that Conley paid to O'Dare's Horse Pullman, Inc., the sum of $84.46 on March 2, 1949, for transporting the horse from Gulf Stream Park to Sunshine Park. Malone testified that he gave Conley the money to pay this bill. On the other hand, Rubin testified that he gave Conley the money to pay the bill and that it was McGough's money. At a continued hearing held on March 30, 1950, Conley was produced and his testimony corroborated Malone in many matters, including the fact that it was Malone who gave him the

money to pay for the trucking bill of March 2, 1949. We therefore find that the transaction occurred as testified to by Malone, namely, that it was his desire to claim the horse, Wild Drift; that he requested Rubin to obtain someone eligible to make the claim to do so for him; that the $8,000 which he turned over to Rubin on January 19, 1949, was not in repayment of a prior gambling transaction but was for the purpose of delivering it to McGough to claim the horse in question; that subsequent thereto Malone at all times acted as the owner of the horse, giving orders to Rubin and Conley as to its training and racing engagements, culminating by the boarding of the horse with original defendant, Richard Atkinson, on or about August 1, 1949. On the other hand, we find that the actions of McGough subsequent to the claiming of the horse were entirely inconsistent with any claim of ownership. He knew nothing about the activities of the horse thereafter and was not even interested in learning whether or not it had won any prize money to which he would have been entitled had he been the real owner.

Plaintiff contends that even though we find the facts as testified to by Malone, our decision must still be in favor of plaintiff because Malone's story reveals an illegal transaction, that is, the claiming of a horse when he was ineligible to do so under the Rules and Regulations of Horse Racing promulgated by Florida State Racing Commission. We cannot agree. In the first place, we have examined the rules and regulations which were offered in evidence and cannot find that the transaction was illegal. It is true that under rule no. 30 a horse is subject to a claim only by an owner, or his authorized agent, who has run a horse at that meeting but the only prohibition which we can find in the rules is that an ineligible owner is prohibited from entering such horse in any future race. Thus, rule no. 82 provides: "If a horse is sold by private treaty, or at pub-

lic auction the written acknowledgment of both parties is necessary to prove the fact that he was sold with his engagements, but when a horse is claimed out of a claiming race, the horse's engagements are not included, but a sale, under any circumstances, to a person ruled off or to a disqualified person, shall not give such person the privilege of racing the horse" which seems to recognize that a disqualified person might buy a horse or claim one. It is true that rule no. 41 provides that the stewards may in their discretion require a person making a claim to take an affidavit that he is not claiming the horse for some other person but there is no evidence in the present case whether or not the stewards required such an affidavit from McGough and in any event the only penalty provided in the rules is the penalty for making a false affidavit. The only rule which might possibly cover the situation is rule no. 60, which provides: "No person shall conspire with any other person for the commission of or connive with any other person in any corrupt or fraudulent practice in relating to racing nor shall he commit such act on his own account" but we are unable to find that the claiming of a horse on behalf of an ineligible person is "any corrupt or fraudulent practice in relation to racing."

It is argued that the alleged fraud was perpetrated against one Veeneman, the former owner of the horse, but we are unable to see how he has been harmed. He entered his horse in an $8,000 claiming race and therefore must have been willing to accept $8,000 for the horse if it were claimed, and he has received the $8,000. He, therefore, is in no worse position than if the horse had been claimed by someone who clearly had a right to do so.

However, even if we assume that this transaction was an improper one, nevertheless McGough was a party to the transaction with equal responsibility and therefore he cannot use the processes of the law to ob-

tain possession. It is a well established policy that as between two equally guilty persons the law will leave them where it finds them. It is true that McGough's testimony does not involve himself in an illegal transaction, but, unfortunately, we have found the facts to the contrary. It follows that judgment must be entered in favor of defendant and intervening defendant.